**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2533
_____

UNITED STATES OF AMERICA,
                                        Appellant

v.

AQUDRE QUAILES


_____

No. 23-2604
_____

UNITED STATES OF AMERICA,
                                        Appellant

v.

AYINDA HARPER


_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Nos. 1:21-cr-00176-001; 1:21-cr-00236-001)

District Judge: Honorable Jennifer P. Wilson
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
July 26, 2024

Before: KRAUSE, CHUNG, and RENDELL, *Circuit Judges*

(Opinion filed: January 17, 2025)

William Glaser
United States Department of Justice
Criminal Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Carlo D. Marchioli
Office of United States Attorney
Middle District of Pennsylvania
Sylvia H. Rambo United States Courthouse
1501 N 6th Street, 2nd Floor
P.O. Box 202
Harrisburg, PA 17102

> *Counsel for Appellants*

Frederick W. Ulrich
Office of Federal Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA 17101

> *Counsel for Appellee Aqudre Quailes*

Jonathan R. White
Dethlefs Pykosh and Murphy Law
2132 Market Street
Camp Hill, PA 17011

> *Counsel for Appellee Ayinda Harper*

_____

OPINION OF THE COURT

_____

KRAUSE, *Circuit Judge*.

During the pendency of these appeals, we issued our en banc opinion in *Range v. Attorney General* (*Range II*), holding that 18 U.S.C. § 922(g)(1) was unconstitutional as applied to the felon in that case who had completed his sentence and filed a declaratory judgment action seeking "protection from prosecution under § 922(g)(1) for any future possession of a firearm." No. 21-2835, 2024 WL 5199447, at *8 (3d Cir. Dec. 23, 2024). We also held during the pendency of these appeals that § 922(g)(1) is constitutional as applied to felons who have not completed their sentences. *United States v. Moore*, 111 F.4th 266, 273 (3d Cir. 2024). Although the defendant in *Moore* was on federal supervised release, *Moore*'s holding and this Nation's "history and tradition" of "disarming convicts who are completing their sentences," *id.*, applies with equal force to defendants who are on state supervised release—including a sentence of parole or probation.

Here, Appellees Aqudre Quailes and Ayinda Harper were separately charged with being felons in possession of a

3

firearm in violation of § 922(g)(1), but the District Court dismissed both indictments as unconstitutional under the Second Amendment. That was an error. Because neither Quailes nor Harper had completed service of their criminal sentence, neither had "a Second Amendment right to possess a firearm." *Id.* We therefore will reverse the District Court's orders and remand the cases for further proceedings.

## I.    Factual and Procedural Background

This appeal concerns two cases that we have consolidated because they raise the same issue. In 2020, Appellee Harper was serving a sentence of Pennsylvania state probation,[1] as well as parole, when his probation officer became aware of several photographs Harper posted on social media in which Harper was holding firearms. Soon after, several probation officers conducted a home visit to Harper's approved state parole address, during which Harper admitted to possessing marijuana and drug paraphernalia in violation of the conditions of his parole. After detaining Harper, the officers discovered a semiautomatic pistol inside of a backpack on the couch and found pictures of Harper holding the same backpack and pistol on Harper's cellphone.[2] Harper, at the time of this arrest, had thirteen prior felony convictions, including five for armed robbery and four for drug trafficking.

---

[1] Harper was serving a type of probationary sentence, following his parole and probation violations, that Pennsylvania calls "intermediate punishment." *See* 42 Pa. Stat. § 9804(a); 204 Pa. Code § 303.12; *Commonwealth v. Hoover*, 231 A.3d 785, 793 (Pa. 2020) (explaining that "both county and state intermediate punishment programs . . . fall under the umbrella of probation").

[2] Harper consented to the search of his residence and cellphone.

In the second case, Appellee Quailes was also on parole with the Commonwealth of Pennsylvania for one of his six prior felony convictions when he was arrested outside of his girlfriend's apartment in 2021 for absconding from parole.  At the time, federal authorities were monitoring Quailes' social media posts, several of which depicted him brandishing various firearms.  After obtaining consent from Quailes' girlfriend to search her apartment, authorities found, among other things, two semiautomatic handguns and dozens of rounds of ammunition.

In the summer of 2021, grand juries indicted Quailes and Harper in separate cases, charging each with one count of being a felon in possession of a firearm in violation of § 922(g)(1).  Quailes and Harper both moved to dismiss their respective indictments, arguing that § 922(g)(1) violates the Second Amendment as applied to them under *New York Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) and *Range v. Attorney General* (*Range I*), 69 F.4th 96 (3d Cir. 2023), *judgment vacated sub nom. Garland v. Range*, 144 S. Ct. 2706 (2024).  In opposition, the Government argued, among other things, that § 922(g)(1) was constitutional as applied to these defendants because state parolees and probationers do not have a Second Amendment right to possess a firearm.[3]

The District Court acknowledged that Quailes and Harper "may lawfully be stripped of a firearm" while on "parole" or "probation" under state law and that each defendant

---

[3] In response, each defendant argued that "his status as a state parolee is irrelevant under the *Bruen/Range* analysis." *United States v. Quailes*, 688 F. Supp. 3d 184, 190 (M.D. Pa. 2023); *United States v. Harper*, 689 F. Supp. 3d 16, 22 (M.D. Pa. 2023).

"may have violated the conditions of [their] state parole by possessing the firearm," but it reasoned that this "does not prove that [Quailes or Harper] did not have a *Second Amendment right* to possess the firearm to begin with." *United States v. Quailes*, 688 F. Supp. 3d 184, 196 (M.D. Pa. 2023) (emphasis added); *United States v. Harper*, 689 F. Supp. 3d 16, 29 (M.D. Pa. 2023) (emphasis added). It then held § 922(g)(1) unconstitutional as applied to both defendants and dismissed their indictments as inconsistent with this Nation's historical tradition of firearm regulation.

The Government timely appealed and reasserts its argument that § 922(g)(1) is constitutional as applied to felons who possess a firearm while on parole or probation.[4]

---

[4] Appellees argue that summary reversal is inappropriate on this ground because the Government forfeited the argument. Not so. The argument was not forfeited because it was presented to the District Court and advanced on appeal, and the Government promptly supplemented its argument with a Fed. R. App. P. 28(j) letter calling our attention to *Moore* soon after it was published. This Court has not "adopt[ed] an unduly narrow construction of Rule 28(j) or a rigid limitation on our discretion to consider relevant new law," *Beazer E., Inc. v. Mead Corp.*, 525 F.3d 255, 264 (3d Cir. 2008), and regardless, we may reach forfeited arguments that relate to an intervening change in controlling case law that occurs while appeal is pending, *see id.* at 263; *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 147 (3d Cir. 2017) (explaining that we can reach a "forfeited issue" when there is an "intervening change in the law").

## II.    Jurisdiction and Standard of Review

The District Court had subject matter jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 18 U.S.C. § 3731.  When reviewing a motion to dismiss an indictment, we review the District Court's legal conclusions *de novo* and its factual findings for clear error.  *See United States v. Menendez*, 831 F.3d 155, 164 (3d Cir. 2016); *United States v. Stock*, 728 F.3d 287, 291 (3d Cir. 2013).

## III.    Discussion

### A.    Second Amendment Framework

The Second Amendment mandates that "the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment "confer[s] an individual right to keep and bear arms" for traditionally lawful purposes, such as self-defense within the home.  554 U.S. 570, 595, 629 (2008).  But "the right secured by the Second Amendment," the Court clarified, "is not unlimited."  *Id.* at 626.  To that end, it cautioned that "nothing in [its] opinion should be taken to cast doubt" on laws like § 922(g)(1) that prohibit "the possession of firearms by felons."  *Id.* at 626–27 & n.26.[5]

---

[5] The Court declared the "longstanding prohibitions on the possession of firearms by felons" to be "presumptively lawful."  *District of Columbia v. Heller*, 554 U.S. 570, 626–27 & n.26 (2008).  When the Supreme Court held that the Second Amendment applies to the States in *McDonald v. City of Chicago*, it "repeat[ed] those assurances," 561 U.S. 742, 786

The Court "made the constitutional standard endorsed in *Heller* more explicit" in *Bruen* by announcing a new two-step analytic framework for analyzing Second Amendment challenges to firearm regulations.  597 U.S. at 31.  Courts must first determine whether "the Second Amendment's plain text covers an individual's conduct."  *Id.* at 17.  If it does, the Second Amendment "presumptively protects that conduct," and courts must proceed to *Bruen*'s second step, where "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Id.*  If the government satisfies its burden, the firearm regulation passes constitutional muster.

In *United States v. Rahimi*, the Court clarified that "the appropriate analysis" under *Bruen*'s second step "involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition."  602 U.S. 680, 692 (2024) (emphasis added).  Under *Rahimi*'s principles-focused approach to analogical reasoning, we

---

(2010) (plurality opinion), as it has continued to do in its most recent Second Amendment case, *see United States v. Rahimi*, 602 U.S. 680, 699 (2024); *see also New York Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 72 (2022) (Alito, J., concurring) (explaining that *Bruen* does not "disturb[] anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns" (citation omitted)); *id.* at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." (quoting *Heller*, 554 U.S. at 626–27)); *id.* at 129–30 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting).

evaluate challenged regulations at a higher level of generality than whether "those regulations [are] identical to ones that could be found in 1791." *Id.* Rather than seeking out a perfect statutory analogue, "dead ringer," or "historical twin," *id.* (quoting *Bruen*, 597 U.S. at 30), we draw on "relevantly similar" historical regulations to derive "principles underlying the Second Amendment" and then ask if the modern-day regulation "comport[s] with th[ose] principles" in terms of "why and how it burdens the Second Amendment right," *id.* at 692, 698.

Applying this framework in *Range II*, we held that the petitioner, who had completed his sentence and brought an as-applied challenge in the form of a declaratory judgment action, was entitled to "protection from prosecution under § 922(g)(1) for any future possession of a firearm." 2024 WL 5199447, at *8. In *Moore*, on the other hand, we rejected an as-applied challenge by a convict who had not completed his sentence and nonetheless possessed a gun while on federal supervised release. We recounted how felons at the Founding were disarmed while completing their sentences, *Moore*, 111 F.4th at 270–71, whether their sentence was served inside or outside of prison, *id.* at 272 (citing a Virginia law imposing sentence of "forced labor on a ship" and a North Carolina law sentencing non-violent convicts to service at direction of the local sheriff), and concluded that "[a] convict completing his sentence on supervised release does not have a Second Amendment right to possess a firearm," *id.* at 273.

In both opinions, we recognized that some Founding-era forfeiture laws disarmed a felon for a wide range of crimes but still allowed him to "[re]acquire arms after completing his sentence and reintegrating into society." *Range II*, 2024 WL 5199447, at *8; *see Moore*, 111 F.4th at 269–71 (observing that

certain forfeiture laws required convicts to forfeit their weapons through at least the end of their sentences). These Founding-era laws, as we explained in *Moore*, "yield[ed] the principle that a convict may be disarmed while he completes his sentence," and this principle justified applying § 922(g)(1) to a convict on supervised release. 111 F.4th at 272. We likened the "historical practice of disarming a convict during his sentence" to "disarming a convict on supervised release" because supervised release is also part of a criminal sentence. *Id.* at 271. Thus, together, *Moore* and *Range II* teach that our Nation's historical tradition of firearm regulation supports disarming a convict who has not "complete[d] his sentence and reintegrate[d] into society," including, as we addressed in *Moore*, convicts who are serving a term of federal supervised release after release from incarceration. *Moore*, 111 F.4th at 272; *see Range II*, 2024 WL 5199447, at *8. We did not have occasion to address in *Moore*, and do today, whether that extends to a sentence of state parole or probation, even if not preceded by imprisonment.

B.    Section 922(g)(1) is Constitutional as Applied to Parolees and Probationers

Under *Bruen*'s first step, we conclude that Quailes and Harper, as adult citizens, are among "the people" presumptively protected by the Second Amendment, *Range II*, 2024 WL 5199447, at *5, and that § 922(g)(1) punishes "quintessential Second Amendment conduct"—possession of a firearm, *Moore*, 111 F.4th at 269. But they possessed a firearm while on state parole, and Harper was also serving a probationary sentence of intermediate punishment. Because offenders on parole or probation are "completing [a] sentence," neither Quailes nor Harper had "a Second Amendment right to possess a firearm" at the time of their § 922(g)(1) offenses. *Id.*

at 273. So under *Bruen*'s second step, we conclude that § 922(g)(1), as applied to Quailes and Harper, "comport[s] with the principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692.

This Nation's history demonstrates a longstanding and uninterrupted tradition of disarming convicts still serving a criminal sentence. Colonial and Founding-era estate forfeiture laws, which "stand for the proposition that convicts could be disarmed while serving their sentences," serve as relevantly similar historical analogues to § 922(g)(1) as applied to a felon who possessed a firearm during the period of his sentence.[6]

---

[6] Under *Bruen*, the government bears the burden of proving that disarming Quailes and Harper is consistent with the principles behind our regulatory tradition. *Bruen*, 597 U.S. at 19. Appellees argue that the Government has not met this burden because these forfeiture laws were not considered by the District Court. They are wrong twice over. The Government and Appellees brought to our attention the Founding-era forfeiture laws we rely on today, and as *Bruen* explains, courts are "entitled to decide a case based on the historical record compiled by the parties"—including any historical commentaries, statutes, or cases introduced by the parties or amici on appeal. 597 U.S. at 25 n.6; *see id.* at 31–70 (considering a broad range of historical sources proffered by the parties and their amici). Moreover, *Rahimi* and *Bruen* allow "courts [to] engage in historical research" based on the historical record provided by the parties. *United States v. Williams*, 113 F.4th 637, 645 n.2 (6th Cir. 2024); *see also United States v. Diaz*, 116 F.4th 458, 468 (5th Cir. 2024) (conducting its "own research" to corroborate and supplement

*Moore*, 111 F.4th at 271 n.3.   These laws, which were ubiquitous at the Founding, stripped felons of their entire estate upon conviction—including any firearms and all other goods and chattels.  *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275–76 (2014) (collecting statutes).[7]   As we explained in *Moore*, felony

_____

"the government's evidence" regarding the Nation's historical tradition of firearm regulation).  At a minimum, we have the discretion to conduct independent legal research and consider past laws and judicial decisions—regardless of whether they were raised below.  *See Bruen*, 597 U.S. at 60; *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024) ("With respect to *legal* sources . . . we may . . . consider laws and other legal sources whether or not the parties have focused on those specific laws or judicial decisions.").  So this Court may rely on historical principles derived in past cases, such as *Moore*, and the historical analogues underlying those principles.

[7] *See also Moore*, 111 F.4th at 270–71 (collecting Founding-era forfeiture laws that "disarmed citizens who had committed a wide range of crimes . . . until they had finished serving their sentences"); *United States v. Goins*, 118 F.4th 794, 802 (6th Cir. 2024) (collecting forfeiture laws and explaining that "forfeiture of the estate, goods, or chattels upon conviction was common during the founding era"); *Diaz*, 116 F.4th at 468 (observing that colonies and states "routinely made use of estate forfeiture as punishment" for felony offenses); *see, e.g.*, Acts of Feb. 1788, *reprinted in* 2 *Laws of the State of New York Passed at the Sessions of the Legislature 1785-1788*, at 632–33, 664–66 (1886) (establishing death penalty and estate forfeiture for crimes such as robbery and counterfeiting); Act of May 5, 1777, *reprinted in* 9 *Statutes at Large; Being a*

forfeiture laws "disarmed citizens who had committed a wide range of crimes . . . until they had finished serving their sentences." 111 F.4th at 271. Under these regimes, convicts could potentially reacquire arms, but only upon successfully serving their sentence and reintegrating into society. Until then, an offender subject to complete estate forfeiture remained disarmed for the entire time that he "was serving out his sentence, not only while he was physically in prison." *Id.* at 272.

Practices into the 19th century provide "confirmation of [what the Founding-era laws] established."[8] *Bruen*, 597 U.S.

_____

*Collection of All the Laws of Virginia, from the First Session of the Legislature* 302–03 (William W. Henning ed., 1821) (punishing forgery with estate forfeiture, whipping, and up to seven years' service on an armed vessel); Act of Apr. 1715, *reprinted in* 1 *Laws of Maryland* 79 (Virgil Maxcy ed., 1811) (punishing with estate forfeiture anyone convicted of corruptly "altering any will or record" in a way that resulted in injury to another's estate or inheritance); Act of Apr. 5, 1790, *reprinted in* 13 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 511–12 (James T. Mitchell & Henry Flanders eds., 1908) (providing that "every person convicted of robbery, burglary, sodomy or buggery . . . shall forfeit to the commonwealth all . . . the lands . . . goods and chattels whereof he or she . . . possessed at the time the crime was committed and at any time afterwards until conviction and be sentenced to undergo a servitude of any term . . . not exceeding ten years").

[8] Where, as here, post-enactment history is consistent with and enhances our understanding of the Second Amendment's original public meaning, it remains a valuable resource for

at 37. Although estate forfeiture laws began disappearing by the early 1800s, *see Folajtar v. Att'y Gen.*, 980 F.3d 897, 905 (3d Cir. 2020), "[d]isarming convicts as part of their sentences continued into the 19th century," *Moore*, 111 F.4th at 271. This post-ratification history and tradition, which is consistent with Founding-era laws, is further probative of the principles underlying the Second Amendment. *Bruen*, 597 U.S. at 35; *see Rahimi*, 602 U.S. at 738 (Barrett, J., concurring) (observing that "postenactment history can be an important tool"); *id.* at 725 (Kavanaugh, J., concurring) (same). Our Nation's historical tradition of firearm regulation thus provides us with the "principle that a convict may be disarmed while he completes his sentence," *Moore*, 111 F.4th at 272, whether that sentence is being served inside or outside of prison.

Consistent with this principle, modern firearm regulations, such as § 922(g)(1), may disarm convicts "on parole, probation, or supervised release." *United States v. Goins*, 118 F.4th 794, 802 (6th Cir. 2024). Federal supervised release, like parole and probation, represents a phase of the criminal sentence where the convict is on supervised release and must observe special restrictions on their liberty.[9] Parole,

---

delimiting the scope of the Second Amendment's protections. *See Lara v. Comm'r Pa. State Police*, No. 21-1832, 2025 WL 86539, at *10 & n.19 (3d. Cir. Jan. 13, 2025); *see also Bruen*, 597 U.S. at 35; *Heller*, 554 U.S. at 605.

[9] Due to the similarity between parole, probation, and supervised release, courts often treat parolees, probationers, and supervisees as indistinguishable for constitutional purposes. *See, e.g.*, *United States v. Hill*, 967 F.2d 902, 909 (3d Cir. 1992) (holding there is "no constitutional difference

like federal supervised release, "is an established variation on imprisonment of convicted criminals" where a prisoner is "release[d] from prison, before the completion of [their] sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence."[10]  *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972); *see also Pa. Bd. of Probation & Parole v. Scott*, 524 U.S. 357, 365 (1998). Likewise, federal and state convicts may be sentenced to a term of probation where the convict avoids imprisonment but is instead supervised and subject to restrictive conditions in his community for the duration of his sentence.  *See* 18 U.S.C. § 3561;  42 Pa. Stat. § 9721(a)(1).    In other words,

---

between probation and parole for purposes of the fourth amendment"); *United States v. Garcia-Avalino*, 444 F.3d 444, 446 n.5 (5th Cir. 2006) ("We do not distinguish between parolees and those on supervised release for the purpose of determining their constitutional rights."); *United States v. Kincade*, 379 F.3d 813, 817 n.2 (9th Cir. 2004) ("Our cases have not distinguished between parolees, probationers, and supervised releasees for Fourth Amendment purposes."); *United States v. Woodrup*, 86 F.3d 359, 361–62 & n.4 (4th Cir. 1996) (collecting cases).

[10] While parole has been around for centuries, federal supervised release is a relatively modern creation.  Congress largely abolished federal "parole" and replaced it with the nearly identical system of federal "supervised release" in 1984. *Johnson v. United States*, 529 U.S. 694, 696–97 (2000); *Moore*, 111 F.4th at 272; *United States v. Paskow*, 11 F.3d 873, 881 (9th Cir. 1993) ("Supervised release and parole are virtually identical systems. Under each, a defendant serves a portion of a sentence in prison and a portion under supervision outside prison walls.").

"[p]robation"—like incarceration, parole, or federal supervised release—"is 'a form of criminal sanction imposed by a court upon an offender'" that is simply "one point . . . on a continuum of possible punishments." *United States v. Knights*, 534 U.S. 112, 119 (2001) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)); *see Samson v. California*, 547 U.S. 843, 850 (2006) (noting that parole is "on the continuum of state-imposed punishments" (internal quotation omitted)); *Mont v. United States*, 587 U.S. 514, 524 (2019) ("Supervised release is a form of punishment that Congress prescribes along with a term of imprisonment as part of the same sentence."). Because parolees and probationers—like convicts on federal supervised release—are still serving their sentences, the Second Amendment affords them no protection.

Here, Harper and Quailes were both serving sentences under state supervision at the time of their § 922(g)(1) offenses. Harper was serving a sentence of probation, and both felons were on state parole when they possessed a firearm. Under Pennsylvania law, probation, including "intermediate punishment," is an explicitly authorized criminal "sentence" that a court may impose, 42 Pa. Stat. §§ 9721(a)(1), 9754(a), 9804(a), 9806(a)(4); 37 Pa. Code §§ 451.1(2), 451.52(a), and "[a] person . . . on parole . . . is in fact still serving out his sentence," *United States v. Dorsey*, 105 F.4th 526, 532 (3d Cir. 2024) (quoting *Commonwealth v. Frankenhauser*, 375 A.2d 120, 122 (Pa. Super. Ct. 1977)). Section 922(g)(1) is thus

constitutional as applied to Harper and Quailes.[11] *See Moore*, 111 F.4th at 271 n.3, 273.

---

[11] Even before *Moore* and today's extension of *Moore* to state parole and probation, nearly all district courts in this circuit to consider the issue correctly determined that § 922(g)(1) was constitutional as applied to state parolees and probationers. *See, e.g.*, *United States v. Benson*, 704 F. Supp. 3d 616, 622 (E.D. Pa. 2023) ("Because [defendant's] right to bear arms had been 'suspended' as a condition of his probation . . . he could not have been engaged in protected 'Second Amendment conduct' at the time that he was arrested." (quoting *Kanter*, 919 F.3d at 461 (Barrett, J., dissenting))); *United States v. Hedgepeth*, 700 F. Supp. 3d 276, 281 (E.D. Pa. 2023) ("[Defendant] was on probation at the time that he was found possessing a firearm and thus had already forfeited his Second Amendment right."); *United States v. Birry*, No. 3:23cr288, 2024 WL 3540989, at *6 (M.D. Pa. July 25, 2024) ("[D]efendant[s] are not engaged in protected Second Amendment conduct when they possess guns while on probation or parole."); *United States v. Campbell*, No. CR 23-141, 2024 WL 2113474, at *6 (E.D. Pa. May 10, 2024) ("18 U.S.C. § 922(g)(1) . . . is not unconstitutional . . . as applied to defendants . . . on parole or probation."); *United States v. Ladson*, No. CR 23-161-1, 2023 WL 6810095, at *7 (E.D. Pa. Oct. 16, 2023) ("§ 922(g)(1) remains constitutional as-applied to those defendants who possess a firearm *while* on parole even if its application would become unconstitutional once parole ends."); *United States v. Terry*, No. 2:20-CR-43, 2023 WL 6049551, at *4 (W.D. Pa. Sept. 14, 2023) ("[P]robationers and parolees . . . are not engaged in protected Second Amendment conduct."); *United States v. Oppel*, No. 4:21-CR-00276, 2023

Section 922(g)(1), insofar as it prohibits felons who are completing their criminal sentences from possessing firearms, "fits neatly within" the principles underlying the Second Amendment. *Rahimi*, 602 U.S. at 698. We thus join our sister circuits in holding that § 922(g)(1) is constitutional as applied to convicts on parole or probation. *See, e.g.*, *Goins*, 118 F.4th at 801–02 (holding that "our nation's historical tradition of forfeiture laws . . . supports disarming those on parole, probation, or supervised release"); *United States v. Gay*, 98 F.4th 843, 847 (7th Cir. 2024) (concluding that "parolees lack the same armament rights as free persons" because "[p]arole is a form of custody" that simply allows a convict to "serve some of his sentence[] outside prison walls").

## IV.  <u>Conclusion</u>

For the foregoing reasons, we will reverse the District Court's orders dismissing the indictments and remand for proceedings consistent with this opinion.

---

WL 8458241, at *2 (M.D. Pa. Dec. 6, 2023); *United States v. Hilliard*, No. 2:23-cr-110, 2023 WL 6200066, at *1 (W.D. Pa. Sept. 21, 2023).